[No. 32607. Department Two. May 20, 1954]

MARTIN R. EWER, *Respondent*, v. A. L. JOHNSON *et al.*, *Defendants*, GEORGE T. RUDD *et al.*, *Appellants*.[1]

[1]Reported in 270 P. (2d) 813.

*Harley W. Allen,* for appellants Rudd.

*Cameron Sherwood* and *Robert A. Comfort (Ross & Harris,* of counsel), for appellants Sperry.

*Tuttle & Luce,* for respondent Ewer.

*Minnick & Hahner,* for respondents Lloyd.

SCHWELLENBACH, J.—This case grows out of collisions involving seven cars in a dust cloud. The collisions took place on a highway running easterly and westerly between Pasco and Walla Walla, at a point about twenty miles west of Walla Walla. The dust cloud extended approximately three hundred feet along the highway. There were fringes at each end at which visibility was fair. However, through the

center, the dust was so thick that visibility ranged from ten feet to zero. It came from a plowed field at the south of the road and was carried in a northeasterly direction by a very strong wind. The dust cloud first became visible from the west at the crest of a slight hill about a half mile away.

At about 1:30 in the afternoon of September 25, 1951, George T. Rudd and his wife, and daughter, Vena, were traveling in a Hudson super six toward Walla Walla. Vena was driving at about fifty miles per hour. When they reached the crest of the hill they saw the cloud of dust and Vena retarded the speed to about half. As they started into the dust, she slowed down some more and turned on the lights. When they had traveled about two hundred feet in the dust cloud (about two thirds through) they saw a car about ten feet ahead. Vena stepped on the brakes, but they hit the car. The impact was not very severe and the car ahead did not stop. That car was being driven by Arthur L. Johnson, who testified that as he got to the edge of the dust he slowed down to ten miles per hour; that he drove at five miles per hour in the dust; that he did not stop; that he was hit in the rear. He described it as "just a bump." He kept going until he got out of the dust and then parked his car and flagged traffic from the east. No cars entered the dust cloud from the east during the time here involved.

The motor in the Rudd car stopped when the collision occurred. Rudd got out and walked to the front of the car. He noticed that the ground was wet with water from the radiator and that the grill was damaged. He told Vena not to start the motor, got a red electric flashlight lantern from the car, and ran back to warn traffic. He saw a lumber truck, driven by Martin R. Ewer, which stopped about ten or fifteen yards from the dust. Rudd told Ewer that he was in trouble, and asked if he would help get him out. Ewer said that he would and started through the dust. As he entered the fringe, he looked through the rear view mirror and saw Rudd standing there with his lantern. Ewer had very little difficulty seeing because, on his truck, he was higher up where the dust was not so thick. He drove around the Rudd

car to the east end of the dust, then back up in the south lane and stopped about ten or twelve feet ahead of the Rudd car. He hooked a chain from the truck to the driver's side of the car. Just as he got up after hooking on to the Rudd car, someone asked him how far it was to Walla Walla. He answered, "Twenty miles." It was Rudd who asked the question, although Ewer did not recognize him at the time. Rudd had stayed at the west end of the dust for two or three minutes and then walked back to his car. As Ewer was walking forward along the south side of the chain, after hooking onto the car, there was a collision with the rear of the Rudd car, which was much more severe than the one with the Johnson car. It pushed the Rudd car up to the truck and pinned Ewer between them, resulting in severe injuries to him which are the basis for this action. Rudd immediately ran to the aid of Ewer. He separated the cars and succeeded in getting Ewer out and laid him down on the pavement alongside of his (Rudd's) car. This took two or three minutes.

As Rudd stood up there was another severe crash which again jammed the Rudd car into the Ewer truck. There was considerable glass flying, and Rudd was struck in the leg by an object which later developed to be a camera belonging to Lloyd. Rudd went back and saw a Studebaker car to the rear of his car. A man's leg was caught in the left front door. Rudd testified that he had a hazy recollection of seeing another car on the opposite side of the highway. He was not able to assist the man whose foot was caught in the door. He got Ewer into his car, went ahead and started the Ewer truck and, with Vena at the wheel of his car, drove out of the dust and on about three miles to Touchet, where he called an ambulance and a wrecker.

R. C. Lloyd testified that he was driving his Nash car toward Walla Walla; that he had slowed down to above five miles an hour before entering the dust; that the fringe was about forty or fifty feet deep; that, as he approached the dust cloud he saw, in his rear view mirror, a car about a quarter of a mile distant; that as he was in the thick dust he saw a

car about ten or fifteen feet ahead; that the moment he stopped he remembered the car in the rear and figured that it would be necessary to pull around the car in front of him or turn around completely and get back out in order to avoid being struck; that he turned to the left for the purpose of passing the car ahead and, when his right front was abreast of the left rear of the car ahead of him (Rudd), he was struck a terrific jolt from the rear; that he then passed out; that when he came to he was lying in the ditch; that he walked to the rear and was later taken to the hospital. Mrs. Lloyd testified that she was given her husband's shirt when he left the surgery at the hospital; and that the left shoulder and part of the back had been well scratched out, or burned out, from gravel, and that it still had gravel in it.

Edward Sperry testified that he and his wife had left Bend, Oregon, that morning in their Studebaker car, intending to drive to Spokane through Walla Walla; that he lived in Santa Barbara, California, and had never encountered a dust storm before; that he was traveling between forty and fifty miles per hour when he noticed a dust cloud between a quarter and a half mile ahead; that, within ten to twenty-five feet of the dust cloud he took his foot off of the accelerator and applied the brakes; that shortly thereafter he struck some object (the Lloyd car); that he was uninjured in that impact; that he started to get out of the car and had his left foot out when a violent impact closed the door on his foot, wedging it tightly between the frame of the car and the bottom of the door; that it must have been from five to fifteen seconds between the time he hit something and the time he was hit. He was severely injured and it took some time to open the door and release his foot.

Uno J. Juhola testified that he left Seattle that morning with his wife and two children in a 1949 Studebaker pickup; that some distance before the crest of the hill Sperry's Studebaker passed him while he was going forty-five miles per hour; that it kept on going and went out of sight; that when he got to the crest of the hill the Sperry car was not visible; that when he got into the light dust he dropped

down to fifteen miles per hour; that, after he got into the heavy dust he saw a car ahead of him (Sperry) and stopped about six or eight feet from it; that the car seemed to be straight across the road; that, just as he stopped, he was hit a violent blow by a Buick belonging to one Gorton, and was forced ahead into the side of the Sperry car.

When it was all over the cars were in the following positions. In the lead, headed easterly, in the south lane, was the Ewer truck. Jammed into it was the Rudd Hudson. They were both fairly close to the center line of the pavement. From six to ten feet behind the Rudd car was the Sperry Studebaker. The rear wheels were in the ditch on the south side of the road. It was almost broadside of the road although headed slightly toward the east. The Lloyd Nash was on the north side of the road headed in a northeasterly direction. The left front wheel was in the north ditch. The right front of the car was about opposite the center of the Rudd car. Its rear was about half way distant from the left rear of the Rudd car and the right front of the Sperry car. The state patrolman testified that it took ten or fifteen steps for him to go backward from the Nash to the Studebaker. It was necessary for him to back up because the dust was blowing from the southwest. The Juhola pickup was on its own side of the road, approximately eight or ten feet west of the Sperry car. The Gorton Buick was approximately three feet behind the pickup.

We shall not relate in detail the damage to the various cars. The front of the Rudd car was damaged somewhat. The left rear, the left rear bumper, and the left fender were damaged. There was some gray paint from the Lloyd right rear fender on the left rear of the Rudd car. The front of the Lloyd car was not damaged. The right rear door and right rear fender were badly smashed. The drive line had been broken from the transmission. The motor had been shoved forward. The left rear panel was pushed forward, buckling the door. The rear bumper was pushed forward in the center. The entire rear was demolished and the car was a total loss. The front end of the Sperry car was com-

pletely smashed. The radiator was shoved back over the top of the engine. There was the imprint of a bumper on the left front door and the left front door post, and both of them were buckled in.

This action was commenced against Johnson and wife, Rudd and wife and their daughter Vena, Sperry and wife, and Lloyd and wife, charging negligence by all of the defendants. The defendants filed separate answers denying the allegations of negligence. Each set up the following affirmative defenses: (1) contributory negligence; (2) unavoidable accident; (3) assumption of risk; (4) *volenti non fit injuria*. The plaintiff, in separate replies, denied the affirmative defenses.

At the close of the plaintiff's case the trial court granted a motion for nonsuit by defendants Johnson. The jury returned a verdict against defendants Rudd and wife and Sperry and wife, in the sum of $40,833.87, but did not find against Vena Rudd and Lloyd and wife. The Rudds and the Sperrys appeal.

Error is assigned to the admission of testimony by witness Frank Buckman concerning a statement made to him by Lloyd. Buckman testified that he came up to the dust cloud after the collisions. Several cars were stopped. He saw Lloyd walking out of the dust, noticed that he was injured, went up to him and drove him to the hospital. Lloyd's jaw was badly cut, so badly that the skin was falling apart from the jaw on both sides. He insisted on talking so Buckman asked how the accident happened. Objection was made that the testimony was not within the orbit of the *res gestae* rule, for the reason that it was given in answer to a question. The court admitted the following testimony:

"A. Mr. Lloyd said that he had come up to this dust cloud and had assumed that it wasn't very far through it so he proceeded into the dust and went on into it at a reduced rate of speed. He said as he got further into it his visibility decreased until finally he could see almost nothing in front of him, finally concluded that he couldn't see enough to proceed so he came to a stop, turned on his lights, and that immediately thereafter he was struck from the rear and that

he didn't know any more until he came stumbling out of the dust cloud."

In *Robbins v. Greene,* 43 Wn. (2d) 315, 261 P. (2d) 83, we said:

"The so-called *res gestae* rule is applied with respect to the admission of testimony concerning statements made by participants in a transaction or by other persons present thereat. The theory of the admission of such testimony is that the statement is made while the person is still under the influence of the act and before there is time for him to fabricate. It may be made in answer to a question, provided it is spontaneous and under circumstances which would negative the thought that it might have been made with design or premeditation."

Without any further discussion of this assignment, we are satisfied that the testimony meets all of the tests set out in *Beck v. Dye,* 200 Wash. 1, 92 P. (2d) 1113, 127 A. L. R. 1022.

It is contended that the trial court erred in refusing to admit a pretrial statement of Ewer offered for purposes of impeachment and because it contained admissions against interest. Ewer, as a witness, admitted that he made the statement and, therefore, no further evidence thereof was necessary or admissible. *Quayle v. Knox,* 175 Wash. 182, 27 P. (2d) 115.

Harry Chisholm, a state patrolman, was called as a witness for the plaintiff. He testified that, from his examination of the cars after the accident, in his opinion the Sperry Studebaker was traveling from thirty-five to forty miles per hour when it struck the Lloyd Nash, and that that amount of damage could not have been inflicted at ten to fifteen miles per hour. This testimony was admitted over vigorous objection. Jack Allegar, who was engaged in the towing and wrecking business, who towed both the Studebaker and the Nash into Walla Walla, was called as a witness for defendant Lloyd. He testified that in his opinion it would not have been possible for the damage to the cars to have been inflicted if the Studebaker had been going ten or fifteen miles per hour. This testimony was likewise admitted over vigorous objection. Marvin Ader, a body and fender repairman,

was called as a witness for defendant Sperry. He testified that, from an examination of the pictures of the damaged cars, it was his opinion that the damage to the Nash could not have happened solely from one impact. This testimony was admitted over the vigorous objections of Ewer and Lloyd. The next day, after discussing the matter in chambers with counsel, the court struck the opinion testimony of the three witnesses, using this language:

"THE COURT: (Addressing the jury): Ladies and gentlemen of the jury, the Court will at this time strike all of the testimony of Officer Harry Chisholm relative to his opinion of the speed of the Sperry vehicle or any testimony given by him where he estimated the speed or the relative damage in connection with speed, and also I will strike the testimony of Jack Allegar wherein he testified as to the rate of speed necessary to do any damage, or any damage that would necessarily be done as a result of speed. I will also strike the testimony of Mr. Ader, the mechanic, all of that testimony given by this witness subsequent to the hypothetical question asked by Mr. Harris in his examination of Mr. Ader, and also all of the cross-examination relative to that portion of his testimony conducted by Mr. Minnick. Does that cover it?

"MR. ALLEN: If the Court please, defendants Rudds may have an exception based on the grounds stated in the record?

"THE COURT: Very well, the record will so show.

"MR. SHERWOOD: May the record show the record made in the chambers?

"THE COURT: It will be shown.

"MR. SHERWOOD: As to each party.

"THE COURT: As to each party. Ladies and gentlemen of the jury, in striking this testimony I also at the same time want to instruct you that you are to disregard that testimony the Court has stricken."

Error is assigned in the admission of the opinion testimony of witnesses Chisholm and Allegar, contention being made that the prejudice caused by such testimony could not be cured by later striking and instructing the jury to disregard it. Error is also assigned in striking the testimony of the witness Ader.

██ We feel that it was improper to admit the opinion testimony of all three witnesses. We can see no distinction

between opinion testimony as to speed and as to the number of impacts. The only reason for permitting expert opinion evidence is to assist and advise the trier of facts in instances where the subject of the testimony is beyond the understanding of an ordinary person. In this case the jury could have drawn their own conclusions from the pictures introduced and from the testimony of witnesses as to the location and extent of the damages to the cars. *Warren v. Hynes,* 4 Wn. (2d) 128, 102 P. (2d) 691; *State v. Carlsten,* 17 Wn. (2d) 573, 136 P. (2d) 183; *Allen v. Porter,* 19 Wn. (2d) 503, 143 P. (2d) 328.

■ Were the errors cured by striking the testimony and instructing the jury to disregard it? We have held that the admission of such testimony is prejudicially erroneous where it is permitted to go to the jury. *Warren v. Hynes, supra.* Here the jury had before it the pictures and other evidence as to the damages. Although most of the legal arguments against the admission of the testimony were made in the absence of the jury, still, in each instance, considerable argument was made before the jury was excused. We are satisfied that the errors were cured by striking the testimony and instructing the jury to disregard it.

Error is assigned in the giving of instruction No. 20:

"One driving into a dust cloud must exercise a very high degree of care. Dust is not a latent or concealed danger; it gives ample notice of its presence. The driver of an automobile proceeding through dust must note all matters which must be considered from the standpoint of the maintenance of due regard for his own safety and that of others.

"If you find from the evidence that the vision of the various drivers was obstructed by a cloud of dust at the time and place in question, and you further find that such driver or drivers did not exercise that degree of care and caution in passing through said cloud of dust as a careful and prudent person would exercise under such circumstances, then such driver or drivers was or were guilty of negligence."

Contention is made that the above instruction is contrary to the rule set out in *Hubbard v. Embassy Theatre Corp.,* 196 Wash. 155, 82 P. (2d) 153:

"The standard of diligence set up by the court for the guidance of the jury must be the legal standard. The employment of such terms as 'greater degree of care,' 'higher degree of care,' 'highest degree of care,' or other like expressions in instructions as indicating the amount of care exacted by the law under special conditions and circumstances, is misleading. Such an instruction is erroneous."

In the first paragraph of the questioned instruction the trial court merely advised the jury as to the amount of care which a careful and prudent person should exercise in entering a dust cloud similar to the one involved herein. The standard of care is the same. The test is the same. The test is, what should a reasonable and prudent driver do under like or similar circumstances. Furthermore, this court has receded somewhat from the rigid rule announced in the *Hubbard* case. In the recent case of *Ralston v. Vessey,* 43 Wn. (2d) 76, 260 P. (2d) 324, we approved the following instruction:

" 'You are further instructed that a pedestrian who is standing or walking on the highway between intersections and at a point other than on a crosswalk has imposed upon him a greater degree of care because of the right of way given to vehicles . . .' "

See, also, *Beireis v. Leslie,* 35 Wn. (2d) 554, 214 P. (2d) 194.

Error is assigned in giving instruction No. 21. No exception was taken to this instruction and the assignment of error will not be considered.

We shall not discuss assignments relating to failure to give certain requested instructions because they were adequately covered by instructions given by the court.

Error is assigned in failing to give appellant Sperry's requested instruction No. A-5, to the effect that the negligence of Rudd, if any, in failing to warn operators of motor vehicles of the presence of his car in the dust cloud would be imputed to Ewer. The proposed instruction did not properly state the law applicable to the facts of this case. There was no agency relationship between Rudd and Ewer.

Both appellants assign error in the refusal of the trial court to order a directed verdict and to grant motions

for judgment notwithstanding the verdict. In considering such motions the evidence and all inferences therefrom must be interpreted most favorably to the respondent and most strongly against the appellants.

As to appellant Rudd, the jury could have found from the evidence, and evidently did, that he went out of the dust cloud with his lantern, stopped Ewer, asked him to assist him, and that Ewer went in, relying upon the fact that Rudd remained outside with his lantern to warn traffic. We cannot say, from the evidence and inferences to be drawn therefrom, that Ewer was guilty of contributory negligence as a matter of law. That was a question of fact to be determined by the jury. The jury was properly and adequately instructed on contributory negligence.

Respondent and appellant Sperry each have different theories as to how the accident happened, and each argues plausibly and at length in favor of his own theory. We do not feel that it is necessary for us to decide which car hit which, and how many times. That was the duty of the jury. It is undisputed that Ewer's injuries were the result of the first crash. The jury could have found from the evidence that Sperry negligently entered the dust cloud at a rate of speed in excess of that which a reasonable and prudent driver should have exercised under the circumstances, and that he jammed into the left rear of Lloyd's car as Lloyd was attempting to pass Rudd, pushing his car into the left rear of the Rudd car, causing it to move forward and pin Ewer between it and the Ewer truck.

The ancient maxim, *volenti non fit injuria*, means, "That to which a person assents is not esteemed in law an injury." The distinction between the doctrine of assumption of risk and the principle involved in the maxim, *volenti non fit injuria*, is that the "doctrine" applies only to cases arising out of the relationship of master and servant or involving a contractual relationship, whereas the "maxim" applies independently of any contract relation. However, the general theory underlying both the doctrine and the maxim is the same. While the defenses of assumption of risk, *volenti non*

*fit injuria,* and contributory negligence are closely allied, they are founded on separate principles of law; contributory negligence involving some breach of duty on the part of the injured person, whereas assumption of risk or *volenti non fit injuria* may bar recovery even though the injured person may be free from contributory negligence. *Walsh v. West Coast Coal Mines,* 31 Wn. (2d) 396, 197 P. (2d) 233.

 The principle underlying the maxim is stated in *Gover v. Central Vermont R. Co.,* 96 Vt. 208, 118 Atl. 874:

"If one knowing and comprehending the danger voluntarily exposes himself to it, though not negligent in so doing, he is deemed to have assumed the risk and is precluded from a recovery for an injury resulting therefrom. The maxim is predicated upon the theory of knowledge and appreciation of the danger and voluntary assent thereto."

 We feel that, from the evidence, it was a question of fact for the jury to determine whether or not respondent came within the purview of the maxim. The jury was given instruction No. 29:

"I further instruct you that when a person knowingly and voluntarily places himself in a position of peril, when he understands and appreciates the peril, he assumes the risks and hazards of his act, and in the event he sustains injury or damage, he cannot recover for such damages. In other words, if he comprehends the nature and the degree of the danger and voluntarily takes his chance, he must abide the consequences, whether he is fortunate or unfortunate in the result of his venture.

"The foregoing principle of law is applicable and controlling even though the party responsible for the condition was negligent, provided the injured person knew of and appreciated the danger and voluntarily made his choice."

The above instruction fairly and adequately advised the jury concerning the maxim, *volenti non fit injuria.*

We find no errors and the judgment is affirmed.

GRADY, C. J., HILL, DONWORTH, and WEAVER, JJ., concur.

July 1, 1954. Petition for rehearing denied.